UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUN -6 PM 3: 57

CLERK

BY_____
DEPUTY CLERK

TYLER GALIPEAU,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　　Case No. 5:14-cv-55
　　　　　　　　　　　　　　　　　)
JOSHUA STEMP and the TOWN OF　　)
BENNINGTON,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　)

**OPINION AND ORDER**
(Docs. 89, 90)

In this police use-of-force case—removed from Vermont Superior Court—Plaintiff Tyler

Galipeau claims that on August 24, 2012 he was viciously beaten by Officer Joshua Stemp of the

Bennington Police Department. (*See* Doc. 1-1.) The court previously denied Galipeau's motion

to remand the case to state court (*see* Doc. 30), and granted the Bennington Police Department's

(BPD) Motion to Dismiss (*see* Doc. 40), leaving as Defendants only Stemp and the Town of

Bennington (the Town). Currently pending are Defendants' respective motions for summary

judgment (Docs. 89, 90). The court heard argument on the motions on May 5, 2016. For the

reasons that follow, Defendants' motions for summary judgment are GRANTED.

**Background**

The court begins with a few remarks about the presentation of the facts for summary

judgment purposes. Although Officer Stemp and the Town have filed separate summary

judgment motions, Stemp adopts the Town's statement of facts. (*See* Doc. 89-1 at 1.) The

following single background statement is therefore drawn from the Rule 56 statements filed by

Galipeau and by the Town. The court has also reviewed the summary judgment record,

including the audio and video recordings made on the night of August 24, 2012 and the morning

of August 25, 2012 (Docs. 91-5, 91-6, 91-22, 91-25).  In addition, the court has considered

Galipeau's Verified Complaint (Doc. 8), which is treated as an affidavit for summary judgment

purposes.  *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003).

Galipeau asserts a "dispute" for 147 paragraphs of Defendants' 320-paragraph statement

of undisputed facts (Doc. 91).  (*See* Doc. 97-12.)  Many of Galipeau's objections fail to properly

dispute the fact that Defendants allege.  The court applies the Rule 56 standard (discussed below)

to determine which facts are indeed properly in dispute.  Therefore, except where noted, the

following facts are undisputed for present purposes.

## I.      Parties and Involved Persons

Officer Joshua Stemp is employed as a police officer with BPD.[1]  He has worked for the

Town since 2005.  Prior to his employment with the Town, he was employed as a deputy sheriff

with the Bennington County Sherriff's Department.

Officer Stemp graduated from the Part-Time Vermont Police Academy in spring 2001

and the Full-Time Academy in November 2001.  At the time of the August 24, 2012 incident,

Stemp had successfully completed the basic training mandated by the Vermont Criminal Justice

Training Council (VCJTC) for all full-time law enforcement officers at the Vermont Police

Academy (VPA) in Pittsford, Vermont.  He had also been certified by the VCJTC as a full-time

police officer in the State of Vermont.  The VCJTC is the agency created by Vermont statute to

establish the standards for the certification of full and part-time law enforcement officers in the

State of Vermont.

---

[1] Since the events at issue in this suit, Stemp has been promoted.  The court refers to him
by the rank he held during the events in question.

Among the trainings that Officer Stemp has received are firearms training, training in the use of force, first aid training, tactical emergency medical specialist training, special response team training, training in the detection of persons under the influence of alcohol, training in advanced roadside impaired driving enforcement, and training in motor vehicle stops and pursuits.

Andy Hunt is also a police officer with BPD.  Officer Hunt graduated from the Alaska Department of Public Safety Academy in 2007 and has been waivered certified by the VCJTC as a full-time law enforcement officer in the State of Vermont since December 2009.  Hunt has received training in the use of force, DUI (driving while under the influence) detection, and accident investigations.  Since January 1, 2012, Hunt has been a certified drug recognition expert, having received advanced training to enable him to recognize impairment in drivers under the influence of alcohol as well as drivers under the influence of drugs other than alcohol.

Paul Doucette is the Chief of Police and Public Safety Director for the Town of Bennington.  Doucette has worked for BPD since January 1990 and is a graduate of the FBI National Academy.

Lloyd Dean was employed by BPD from June 1982 to June 26, 2015.  He retired from BPD at the rank of lieutenant.  One of his responsibilities while employed with the Town was to conduct internal investigations.

Joel Howard is a sergeant with the Bennington County Sherriff's Department.  Howard is trained in the detection of individuals who are under the influence of alcohol.  He also has advanced use-of-force training and is a use-of-force instructor.  In addition to first aid training, he has had emergency first responder training and is a certified firearms instructor.

At the time of the August 24, 2012 incident, Plaintiff Tyler Galipeau was 30 years old and resided in Bennington County. He had two prior convictions for DUI. When he was three years old, he lost vision in his left eye as a result of being poked in the eye with a pair of scissors. Galipeau attended grade school and high school in Bennington. He was an accomplished wrestler in high school. Ted Galipeau is Tyler Galipeau's father.

Stuart DuBoff is a board certified ophthalmologist who has treated Galipeau since his childhood injury. Gregory King is certified by the American Board of Family Medicine and works at Mt. Anthony Primary Care. Dr. King has treated Galipeau through a program in which Galipeau was prescribed Suboxone to treat his opioid abuse.

Thomas Sterling is board certified in emergency medicine and works for Dartmouth-Hitchcock at Southwestern Vermont Medical Center (SVMC). Dr. Sterling treated Plaintiff following the August 24, 2012 incident. Christine Mroz is a registered nurse and former employee of SVMC. Nurse Mroz was the triage nurse who treated Galipeau following the incident. Paul Vinsel is board certified in emergency medicine and works at SVMC. Dr. Vinsel saw Galipeau a day after the August 24, 2012 incident.

Paula Shulman is a social worker and a drug and alcohol counselor. She began working with Galipeau in 2009 in connection with his family life, anxiety, and his disability due to his eye injury. At that time, Shulman concluded that Galipeau suffered from post-traumatic stress disorder (PTSD) specifically related to the childhood injury to his eye.

## II.   Prior Interactions Between Galipeau and Officer Stemp

On October 25, 2003, Stemp was working for the Bennington County Sheriff's Department as a Deputy Sheriff. On that date, he attempted to stop a vehicle being operated by Galipeau for driving erratically. Galipeau pulled into a parking lot, jumped out of his car, and

fled the scene of the car stop.  Galipeau claims that the next day he went to the Sheriff's office

with his father, Ted Galipeau, and told Stemp that he was sorry.  Then, according to both Tyler

and Ted Galipeau, Stemp told Tyler that he was going to "get" him.  (*See* Doc. 91-7 at 13; Doc.

91-8 at 6.)[2]  Neither Tyler nor Ted Galipeau ever reported what Stemp allegedly said.  Ted

Galipeau was not bothered by what Stemp allegedly said.  Stemp issued Tyler Galipeau two

tickets in connection with the October 25, 2003 incident.  (Doc. 91-3 at 2–3.)

On or about March 10, 2004, Stemp stopped a vehicle that Tyler Galipeau was operating

in Pownal, Vermont.  Galipeau says that he did not understand why he was being pulled over

because he was only traveling two miles per hour over the speed limit.  (*See* Doc. 91-7 at 22.)  It

is undisputed that Stemp issued Galipeau a ticket for operating on a suspended license.  (*See*

Doc. 91-3 at 4.)  Galipeau asserts that Stemp "knew exactly where [Galipeau] was" because

Galipeau's passenger's friend was a law enforcement officer.  (*See* Doc. 91-7 at 23.)  Galipeau

asserts that Stemp was polite at the beginning of the traffic stop, but at the end Stemp was trying

to get him "to say something."  (*Id.*)  Stemp had never arrested Galipeau prior to August 24,

2012.  After the 2003 and 2004 traffic stops, Galipeau had no further interactions with Stemp

until the August 24, 2012 incident.

## III.   The August 24, 2012 Incident

On Friday, August 24, 2012, shortly before 11:00 p.m., Officer Stemp was working for

BPD running stationary radar in the parking lot of Bennington Tire located on Benmont Avenue

in the Town of Bennington.  Stemp was in a fully marked Town of Bennington police cruiser.

The cruiser was equipped with a mobile recording device, which began to record when the

---

[2] Stemp denies that he ever said those words to Tyler Galipeau.  (Doc. 91-1 at 15.)  For
present purposes, the court accepts Tyler and Ted Galipeau's account as true.

cruiser's lights and siren were activated. Also on that date, Deputy Sheriff Howard was on duty for the Bennington County Sheriff's Department. Shortly before 11:00 p.m., he was in his cruiser, which was parked next to Stemp's in the parking lot of Bennington Tire. The two cruisers were parked in opposite directions as they both ran stationary radar.

The posted speed limit on Benmont Avenue in the area of Bennington Tire was 30 mph. At approximately 10:55 p.m., Stemp observed a truck traveling southbound on Benmont Street at a speed greater than the posted speed limit. The operator of the truck was later identified as Galipeau, although the truck did not belong to him. Stemp visually estimated the speed of the truck at approximately 40 mph, and his radar device indicated a speed of 43 mph. The truck was not being driven erratically, according to Stemp. (*See* Doc. 91-1 at 46.)

As the truck passed the cruiser, Stemp pulled onto Benmont Avenue. Stemp followed the truck as it turned onto County Street, at which time he activated the cruiser's blue lights. The truck turned onto Lincoln Street and pulled to the side, just north of the Bennington Village Fire Department.

Stemp pulled in behind the truck and exited his cruiser to approach the driver. After Stemp took one or two steps toward the truck, Galipeau drove off at a high rate of speed. Galipeau claims that he drove off because he recognized Officer Stemp and was scared of him because of the 2003 and 2004 encounters. (*See* Doc. 91-7 at 20–21.) Stemp could not see the driver and did not know his identity. Stemp returned to his cruiser and radioed dispatch that the driver had taken off.

Unbeknownst to Officer Stemp, when he left the parking lot at Bennington Tire, Deputy Howard saw a passenger in the truck and decided to provide backup for the motor vehicle stop. As Howard came to the scene of the motor vehicle stop on Lincoln Street, he saw Stemp walking

6

towards the truck.  Howard then saw Stemp return to his cruiser.  When Galipeau drove off, Stemp gave chase with the lights and siren activated.  Deputy Howard followed the pursuit with his lights and siren activated.  Howard also activated his cruiser's mobile video recording device.

With Stemp in pursuit, and with other motorists on the road, Galipeau drove through a stop sign at the intersection of Lincoln Street and River Street without stopping.  Galipeau was exceeding the speed limit, and failed to stop at the stop sign as he drove through the four-way intersection at River and Depot Streets.  Galipeau also drove onto the sidewalk in front of The Pharmacy building and struck a bench.  Galipeau drove along the sidewalk and turned onto Gage Street without stopping.  Galipeau then pulled into the parking lot of C.L. White, a local business on Gage Street, coming to a stop in the middle of the parking lot.

After pulling into the parking lot of C.L. White, Galipeau exited the truck and ran off on foot.  Stemp did not recognize Galipeau when he exited the truck.  Stemp began to chase Galipeau on foot.  Stemp instructed Galipeau to show his hands and yelled repeatedly for Galipeau to stop, but Galipeau kept running.  Galipeau says that he does not recall hearing anyone say anything at that time.  (Doc. 91-7 at 28.)  Stemp instructed Galipeau to show his hands in case Galipeau was carrying a weapon.  Stemp had received training highlighting the danger that individuals fleeing from police can pose to officers and the public.  Stemp did not know if Galipeau was fleeing a crime scene or whether he was a fugitive from justice who was trying to avoid being caught.

Deputy Howard pulled into the parking lot and observed the foot chase.  He saw Stemp chasing Galipeau around the right side of a garage as Stemp yelled at Galipeau to stop.  Howard yelled at the passenger in the truck to remain inside.  Howard then ran to the side of the garage in an effort to possibly intercept Galipeau from a different angle.

Galipeau says that Stemp caught up to him and grabbed the back of his shirt, but then fell down while Galipeau kept running. (*See* Doc. 91-7 at 28.) Stemp says that he "tackled" Galipeau on the pavement, and that he and Galipeau both fell to the ground. (Doc. 91-1 at 30.) Stemp was injured in the fall, scraping his knee and sustaining "road rash" on both forearms. (*Id.* at 31.)

Deputy Howard encountered Stemp and Galipeau as the two ran onto Gage Street.[3] Howard states that, as Stemp was tackling Galipeau, he (Howard) grabbed Galipeau's arm, and all three men went down onto the pavement. (Doc. 91-4 at 3.) Stemp was focused on Galipeau and was not aware of Howard's presence. Galipeau broke free and continued to run away.

Stemp and Howard continued chasing Galipeau. Stemp caught up to Galipeau and tackled him behind a house on the corner of Gage and School Streets. Stemp did not recognize Galipeau when he tackled him. Howard saw Stemp tackle Galipeau and saw both men go to the ground.

Galipeau was lying face down on the ground and Stemp was off to his right side. It was dark. Galipeau's hands were underneath his body, and Stemp could not see them. Galipeau asserts that his hands were "pinned" beneath him. (Doc. 8 at 3.) Stemp had been trained that it is an immediate threat to police officers when a suspect's hands are not visible. Galipeau said, "You got me dude. You got me." (Doc. 91-5, 22:56:30–32.)[4] According to Galipeau, he felt the

---

[3] Galipeau disputes this fact, asserting that he did not see or hear another person during the foot pursuit, and that Stemp did not radio anyone during the foot pursuit. Assuming those assertions are true, neither proves that Howard was not present as Stemp and Galipeau ran onto Gage Street.

[4] Many of the statements made during and immediately after the foot chase are captured on both the recordings from Officer Stemp (Doc. 91-5) and Deputy Howard (Doc. 91-6). No video footage captured the scene where Galipeau was tackled and taken into custody.

pressure of what he thought were Stemp's knees on the back of his head or on his back. (*See* Doc. 91-7 at 30–31.)

The parties have diverging versions of the next sequence of events, all of which occurred within a matter of seconds. According to Galipeau, he continued to say "I give up," and—while his hands were behind his back and he was being handcuffed—he turned his head to look over his right shoulder, saying "I give up." (Doc. 91-7 at 31.)[5] Galipeau's testimony is ambiguous as to whether the handcuffs had been applied *before* he turned his head. (*See id.* at 34 ("I put my hands behind my back and then they cuffed me. . . . [Then] I kept saying, 'I give up,' because I was getting, you know, knees and stuff into the back.").)

According to Stemp, Galipeau continued to yell "you got me, you got me," and then— before Stemp had gained control of Galipeau's hands—Galipeau "turn[ed] around" to face him. (Doc. 91-1 at 33.) When asked whether Galipeau rolled over on to his back, Stemp testified that Galipeau "was rolling over to face me." (*Id.* at 34.) Stemp testified that Galipeau did not say "I give up," (*id.* at 34), and that Galipeau's hands did not grab him, his legs did not kick him, and that the event happened so quickly that he could not tell if Galipeau's body had tensed up (*id.* at 36–37). However, according to Stemp, Galipeau's "head and his body" were turning toward him. (*Id.* at 36.) Stemp states that he believed that Galipeau was trying to "get a position of advantage" and was going to try to fight him. (*Id.* at 35–36.) At that moment, according to Stemp, he was not leaning or kneeling on Galipeau, but was off to Galipeau's right. (*Id.* at 34.)

Stemp had been trained that when a subject has committed several serious offenses and is actively resistant, the subject poses an immediate threat of physical injury to officers and to the

---

[5] This section of Galipeau's deposition testimony does not describe whether the handcuffs had been successfully applied to both hands at the time he turned his head, only that he had his hands behind his back and was in the process of being handcuffed. (*See id.*)

general public.  Officers, including Stemp, are trained that when a suspect rolls to their back, the officer loses a position of advantage and is faced with the danger of ground fighting.  Officers are also trained that once a subject rolls to his back, the subject is in a position to utilize the ground for stability in order to kick the officer.  Stemp was concerned because he did not know if Galipeau had any weapons on him or within his reach.  Stemp does not carry a baton and has never carried a baton while working for BPD.

It is undisputed that Officer Stemp struck Galipeau; it was a downward strike across the right side of Galipeau's face.  Stemp asserts that he struck Galipeau once using a bare, closed left fist.  (*Id.* at 37; *see also* Doc. 91-2 at 6.)  Stemp says that he was not holding any implement in his hands.  (Doc. 91-1 at 37; *see also* 91-2 at 6.)  Galipeau has testified that he does not know what he was struck with.  (Doc. 91-7 at 35.)  However, he asserts that that it was a "heavy-blunt instrument," and that he was struck several times.  (Doc. 8 at 3.)[6]  He contends that the injuries he sustained (described below) are not consistent with a closed-fist strike.  (Doc. 97-12 at 6.)[7]

There is a dispute about whether Galipeau lost consciousness as a result of the strike.  In the Complaint and in deposition testimony, Galipeau asserts that he did briefly lose consciousness.  (*See* Doc. 8 at 3; *see also* Doc. 91-7 at 32 ("I went unconscious for three or four seconds.").)  Stemp maintains that Galipeau did not lose consciousness because he "was verbal with us."  (Doc. 91-1 at 44.)[8]

---

[6] In his deposition, Galipeau stated that he believed it was a flashlight.  (Doc. 91-7 at 35.)

[7] Additional facts regarding whether a weapon or baton was used appear below in the discussion regarding his treatment at SVMC.

[8] Additional facts regarding whether Galipeau lost consciousness appear below in the discussion regarding his treatment at SVMC.

The following exchange is undisputed, except to the extent that it conflicts with Galipeau's timeline about being handcuffed before he was struck.[9]  After Stemp struck Galipeau, he told Galipeau to "give me your hand."  (Doc. 91-5, 22:56:39–40.)  Galipeau said, "You broke my face, dude."  (*Id.*, 22:56:41–42.)  Stemp again ordered Galipeau to "give me your hand.  Do it now."  (*Id.*, 22:56:43–44.)  Ultimately, Officer Stemp and Deputy Howard succeeded in grabbing Galipeau's hands.  Howard then assisted Stemp in handcuffing Galipeau.  (*See* Doc. 91-1 at 44; *see also* Doc. 91-4 at 3.)

Returning to the question of when the handcuffs were applied, the court notes that, after Galipeau said "You broke my face, dude" (and thus after Stemp had struck Galipeau), there are sounds on the audio recording—"clicking" sounds separated by a few seconds—that are consistent with handcuffs being applied.  (Doc. 91-5, 22:56:52; *id.* at 22:56:59.)  Plaintiff insists that the sounds are "unrecognizable."  (Doc. 97-12 at 9.)  BPD Lieutenant Lloyd Dean describes the sounds as being "clearly audible" sounds of handcuffs being applied.  (Doc. 91-14 at 5, ¶ 22.)  The court concludes that there is no triable issue on the issue of the timing of the application of the handcuffs.  As noted above, Galipeau's testimony is, at best, ambiguous.  The sounds of the handcuffs being snapped shut are clearly discernable on the audio recording.  Moreover, the audio recording plainly establishes that Stemp was asking for Galipeau to give him his hand *after* striking him.  Those facts establish that the handcuffs were not successfully applied until after Stemp had struck Galipeau.

Stemp asserts that, during the struggle, he could smell "a strong odor of alcohol" on Galipeau's breath.  (Doc. 91-2 at 8, ¶ 59.)  Galipeau concedes that he was taking Klonopin (an

---

[9] The exchange can be heard on the audio recordings (Docs. 91-5, 91-6).

anti-anxiety/panic disorder medication) (*see* Doc. 97-1 at 5), but he says that he does not recall

drinking any alcohol on August 24, 2012.  (Doc. 91-7 at 19.)

     Galipeau repeatedly complained that his "eye socket is out."  The officers rolled him on

his side and Stemp and Howard could see that Galipeau was bleeding above his right eye.  Based

upon his experience as an Emergency Care Attendant—First Responder, Howard concluded that

the cut was likely to continue to bleed heavily for a short time but was not life-threatening.

Based upon his experience and his training in first aid, Stemp knew that cuts to the face generally

bleed for a short time, but are not life-threatening.  Even minor cuts on someone's face or head

can bleed profusely because facial vasculature is significant in terms of the number of blood

vessels in the face.

     Howard radioed for an ambulance.  Galipeau repeated that his eye socket was out.  As the

officers walked Galipeau back to the parking lot, Galipeau complained that he could not see, and

Howard told him to stop running his mouth and just walk.  In the meantime, BPD Officers

Andrew Hunt, Thomas Bull, and Sergeant Michael Plusch arrived at the C.L. White parking lot.

     According to Deputy Howard, Galipeau was "not cooperating" as Howard attempted to

escort him back to the cruisers.  (Doc. 91-4 at 4.)  Howard states that Galipeau "kept trying to

pull away from me and was spitting at me."  (*Id.*)  Galipeau notes that he verbalized his

cooperation, telling Howard, "Dude, I'm walking with you."  (Doc. 91-5, 22:57:49–51.)  There is

a dispute about whether Galipeau was spitting blood *at* Howard—as noted below, Galipeau

needed to spit out blood due to his injuries.

     Galipeau kept spitting and Howard finally told him something to the effect of, "You spit

at me one more time and you're going to be spitting the rest of your . . . teeth out, you understand

me?"  (*Id.*, 22:58:22–25.)  Howard walked Galipeau to his cruiser and bent Galipeau over the

hood.  Galipeau accused Howard of hitting him in the face with Howard's gun.  Howard told Galipeau that no one had a gun out.  Galipeau then said, "So you're telling me your fist is that tough?  Your fist is that tough to hit me like that?"  (*Id.*, 22:59:16–21.)

Galipeau also yelled at the passenger in the truck, saying something to the effect of: "Kraus, Kraus, Kraus, look at what he did to my face dude." (*Id.*, 22:59:31–35.)  Galipeau then stated, "I gotta spit—I gotta spit blood out—can I spit blood out?" (*Id.*, 22:59:41–44.)  Speaking to one of the other officers who had arrived at the parking lot, Galipeau said, "They whacked me with the . . . butt of a gun dude." (*Id.*, 22:59:48–51.)  Howard told Galipeau, "Nobody even had a gun out stupid." (*Id.*, 22:59:51.)

Sergeant Plusch observed Galipeau's demeanor and decided that Galipeau should be examined by the Bennington Rescue Squad back at the police station.  Plusch redirected the rescue squad from the scene to the police station.  Deputy Howard transported Galipeau to the police station in the back seat of his cruiser.  Stemp and Officer Hunt remained at the scene to take photographs.  Bennington Rescue arrived at the scene at approximately 11:00 p.m.  At approximately 11:02 p.m., Bennington Rescue was redirected to the Bennington police station.

According to Deputy Howard, there was a "strong odor of intoxicants coming from Tyler" during the cruiser ride to the police department.  (Doc. 91-4 at 5.)  As noted above, Galipeau's testimony is that he was taking Klonopin but does not recall drinking alcohol that night.  Also according to Howard, the rescue squad was at the police station when he arrived with Galipeau.  Howard recounts that:

> One of the EMTs came over to my cruiser and I opened the door so that he could see and speak with Tyler.  The EMT asked Tyler if he wanted any assistance and Tyler screamed at the EMT, using several profanities, and told the EMT to get away from him.  The EMTs left the police department.

13

(Doc. 91-4 at 5.)  Galipeau's testimony is that he does not remember whether an ambulance came to the police station to tend to him.  (Doc. 97-2 at 114.)[10]

Officer Stemp returned to the police department approximately five or ten minutes after Galipeau had been transported there.  Galipeau was in the holding cell at that time.  Stemp began to assemble paperwork to process Galipeau for DUI.  As noted above, Galipeau's testimony is that he was taking Klonopin but does not recall drinking alcohol that night.

While Galipeau was in the holding cell he stated that he needed stitches in his upper lip and on his eyebrow.  There is a dispute about whether Galipeau made any additional requests for medical attention while at the police station.  According to Galipeau, he continually asked to be taken to the hospital, specifically asking "take me to the hospital, I can't see."  (Doc. 97-2 at 114.)  Galipeau asserts that at that time he was bleeding into a drain, and that three or four police personnel were "just looking at me the whole time."  (*Id.*)  According to Defendants, Galipeau did not tell Stemp or anyone from BPD that he needed any medical treatment other than stitches on his upper lip and on his eyebrow.  (*See* Doc. 91-20 at 4, ¶¶ 22–23.)[11]

---

[10] The recording from Deputy Howard's cruiser (Doc. 91-6) ends before the alleged exchange with the EMT.

[11] Document 91-20 is Defendants' Requests for Admission dated June 1, 2015. Paragraph 22 is a request that Galipeau admit "that you did not tell Defendant Stemp that you needed any medical treatment other than stitches on your upper lip and your eyebrow." Paragraph 23 is a request that Galipeau admit "that you did not tell anyone from the Bennington Police Department that you needed any medical treatment other than stitches on your upper lip and your eyebrow." Galipeau did not respond to the June 1, 2015 requests for admission.  The effect of Galipeau's failure to respond is that the matters are admitted.  *See* Fed. R. Civ. P. 36(a)(3).  However, in light of Galipeau's deposition testimony, the court declines to conclude that the facts alleged in paragraphs 22 and 23 are conclusively established.  This conclusion will promote the presentation of the merits, and the court is not persuaded that it will cause any prejudice.  *See* Fed. R. Civ. P. 36(b).

At approximately 11:36 p.m., Bennington Rescue was dispatched to return to the police station. Bennington Rescue advised dispatch that they would travel to the police station in unit ALS1, which is a "rapid response vehicle" but not an ambulance. The ALS1 unit is not used for transporting individuals to the hospital. They arrived at the police station at approximately 11:37 p.m. Officer Hunt and Deputy Howard both state that, when the rescue squad returned, Galipeau refused treatment. (Doc. 91-4 at 6, ¶ 27; Doc. 91-11 at 3, ¶ 13.) Galipeau's testimony is that he does not recall whether an EMS crew came to the police station to tend to him. (Doc. 97-2 at 114.) One of the members of the rescue squad told Stemp that they did not have a vehicle available at that time to transport Galipeau to the hospital and that it would take approximately 25 minutes to return with an appropriate vehicle. (*See* Doc. 91-1 at 57; Doc. 91-2 at 10, ¶ 72.)

Officer Hunt took photographs of Galipeau's injuries. Hunt—who was investigating the motor vehicle collision with the bench in front of The Pharmacy—attempted to interview Galipeau, but found him to be "not cooperative." (Doc. 91-11 at 2, ¶ 7.) Hunt also states that Galipeau "emitted a strong odor of intoxicants from his person and breath while I was in contact with him." (*Id.*) Hunt's opinion, based on his training, experience, and observations, is that Galipeau was under the influence of alcohol. (*Id.* at 3, ¶ 12.) As noted above, Galipeau's testimony is that he was taking Klonopin but does not recall drinking alcohol that night. Galipeau's response is the same regarding Deputy Howard's testimony (Doc. 91-4 at 4, ¶ 19, *id.* at 6, ¶ 30) that he, too, could smell an odor of intoxicants on Galipeau, and that he also concluded that Galipeau was intoxicated.

## IV.    First Visit to SVMC

When they learned that Galipeau was not going to be transported by rescue for at least 25 minutes, Officer Stemp and Deputy Howard transported him to SVMC in Howard's cruiser.

15

Galipeau was transported to SVMC at approximately 11:52 p.m. on August 24, 2012.  Galipeau arrived at the hospital at 11:57 p.m.  He walked into the Emergency Department, and was put into an examination room.  Stemp explained to Christine Mroz, the triage nurse, that Galipeau was in custody for a DUI, leaving the scene, and resisting arrest.

Galipeau spoke to Mroz about what he claimed the officers had done to him.  Mroz's treatment notes regarding Galipeau's "pertinent history" indicate that "police used baton on [patient]."  (Doc. 91-17 at 13.)  Mroz testified that, in making notes regarding "pertinent history," she could use information supplied by the patient, but in this case she believes that she received the information about the baton from Officer Stemp.  (*Id.* at 16.)  Stemp insists that he never told Mroz that a baton was used on Galipeau.  (Doc. 91-2 at 10, ¶ 75.)

When Galipeau arrived at the hospital he was categorized by the triage nurse as an ESI-4, meaning that she had determined that he did not have a life-threatening condition.  According to Mroz, when she treated Galipeau, he denied having lost consciousness.  (Doc. 91-17 at 7–8.)  Galipeau says that he does not recall any conversations at the hospital.  (Doc. 97-2 at 116.)

Mroz assessed Galipeau at 12:20 a.m.  According to Mroz's recollection of her assessment: "[P]retty much everything looks good about him except he had a laceration to his right eyebrow.  It was not bleeding at the time.  He did have some dried blood to [h]is upper face, so probably his forehead area.  But there was no swelling noted to his face."  (Doc. 91-17 at 10.)[12]  On the consent-to-treat form, Mroz wrote that Galipeau was intoxicated.  She testified that she does not remember if she could smell alcohol on Galipeau, but that he was "exhibiting signs of intoxication."  (Doc. 91-17 at 12.)  Mroz signed for Galipeau to be treated.

---

[12] Galipeau maintains that he had additional injuries not covered by Nurse Mroz's assessment.  Galipeau's injuries are discussed in detail below.

Dr. Thomas Sterling examined Galipeau at approximately 12:30 a.m. on August 25, 2012. Dr. Sterling testified that, if Galipeau had complained of loss of consciousness, nausea, or vomiting, that would have been noted in the medical records, but that there was no note regarding those conditions. (Doc. 91-16 at 9.)  Galipeau disagrees, noting Dr. Sterling's statements that loss of consciousness, nausea, or vomiting would be questions covered by a review of ten body systems, but that Dr. Sterling testified that he did not "know which [systems] [he] asked [about] at that point."  (Doc. 91-16 at 10.)

It is undisputed that Dr. Sterling listed in his record "alcohol ingest" as one of Galipeau's "pertinent positives."  (*Id.*)  Dr. Sterling did not note any quantity of alcohol because, according to his testimony, "it either was not remarkable enough in fashion and/or it appeared that I didn't ask that specific question." (*Id.* at 11.)  As noted above, Galipeau's testimony is that he was taking Klonopin but does not recall drinking alcohol that night.

Dr. Sterling observed that Galipeau was in no acute distress.  He also noted no problems with Galipeau's eyes, and that there was no nasal deviation or discharge of blood or mucus.  Dr. Sterling also noted that Galipeau's teeth were intact, and that they were not loose upon evaluation or palpation.[13]

It is undisputed that Dr. Sterling ordered CT scans of Galipeau's brain and head, cervical spine, face, and jaw.  The CT scan revealed no evidence of an intracranial bleed.  (Doc. 91-16 at 18.)[14]  The CT scan also revealed no evidence of a cervical spine injury, and that Galipeau's jaw or mandible was "fine."  (*Id.* at 20–21.)  The CT scan did reveal a "displaced right nasal

---

[13] Galipeau recites materials from his medical record, arguing that he did have injuries to his nose and teeth, among other things.  His injuries are discussed in more detail below.

[14] Galipeau asserts that his medical records show that he had an intracranial bleed.  That issue is discussed below.

bone fracture." (*Id.* at 18.)  No "reduction" (i.e., setting of the bone) was performed on Galipeau's nose, nor was a splint applied.[15]  Dr. Sterling did not conclude that Galipeau had either a fractured tooth or a concussion.  (Doc. 91-16 at 25.)[16]  Galipeau was not given any pain medication at the hospital or prescribed any pain medication upon leaving the hospital.  Dr. Sterling testified that the medical treatment Galipeau received would not have been any different if he had been admitted at 11 p.m. instead of 11:57 p.m.  (Doc. 91-16 at 27.)

Officer Stemp received authorization from emergency room medical providers to speak with Galipeau so that he could process Galipeau for DUI.  As noted above, Galipeau does not recall any conversations at the hospital.  (Doc. 97-2 at 116.)  However, Stemp states that he read Galipeau his *Miranda* rights, and that Galipeau declined to speak with Stemp until his attorney was present.  Stemp also states that he read Galipeau his implied-consent rights, and that Galipeau responded that he did not know what to say until his attorney was present.  Stemp asked Galipeau for the name of the attorney that Galipeau wished to call, and Galipeau stated that he wanted to call his mother.  At approximately 12:21 a.m. on August 25, 2012, Stemp contacted Galipeau's mother and allowed him to speak to her by telephone.

Galipeau's mother did not come to the hospital, but his father, Ted Galipeau, did.  Stemp allowed Ted to visit with his son.  At approximately 12:58 a.m., Stemp called Attorney Elizabeth Kruska so that Galipeau could consult with her.  After Galipeau spoke with Attorney Kruska,

---

[15] Galipeau asserts that Dr. Sterling testified to having to reset the bone in connection with the nose fracture.  (Doc. 97-12 at 23.)  Dr. Sterling did testify that in a "closed reduction," "you basically set the bone without having to do any surgery."  (Doc. 91-16 at 21.)  But Dr. Sterling did not testify that that was actually done in Galipeau's case—rather, Dr. Sterling specifically testified that no reduction was performed on Galipeau.  (*Id.*)

[16] Again pointing to his medical records, Galipeau contends that he did sustain a fractured tooth and a concussion.  Those issues are discussed below.

Stemp asked Galipeau numerous times if he would consent to give a sample of his blood as evidence. When Galipeau refused to respond to the question, Stemp treated Galipeau's actions as a refusal to submit to the test.

## V.     Second Visit to SVMC

After being released from SVMC, Galipeau was lodged at the Marble Valley Correctional Center in Rutland, and then released on bail. At 9:58 p.m. on August 25, 2012, Tyler Galipeau returned to SVMC with Ted Galipeau. Dr. Paul Vinsel performed a physical examination of Tyler Galipeau at approximately 10:50 p.m. Ted Galipeau was present for the examination. At the time Tyler Galipeau saw Dr. Vinsel, he was complaining about headaches, right jaw pain, blurred vision, and being nauseous. He also had not taken his Klonopin for two days; nausea is a common side-effect of stopping Klonopin suddenly.

During his visit with Dr. Vinsel, Galipeau stated that he thought he had lost consciousness for an unknown amount of time. Galipeau was not sure whether he had in fact lost consciousness. When Dr. Vinsel examined Galipeau, Galipeau was only in mild distress.

Dr. Vinsel examined Galipeau's eyes and they looked good, with no signs of injury. Dr. Vinsel examined Galipeau's teeth and found no significant injury. Dr. Vinsel found that Galipeau had tenderness on the right side of his jawbone and cheek area, but that there was no fracture. In his assessment of Galipeau, Dr. Vinsel listed concussion syndrome. The symptoms of concussion syndrome that Galipeau described were headache, nausea, and dizziness.

Dr. Vinsel reviewed the CT scans that had been taken of Galipeau during his previous visit to SVMC. Dr. Vinsel's review of the scans revealed no evidence of mandible or tooth fracture. Dr. Vinsel also did not conclude that Galipeau suffered an intracranial bleed. Dr. Vinsel did not prescribe any pain medication for Galipeau.

19

## VI.   Galipeau's Injuries

Galipeau asserts that he suffered a laceration to his right eyebrow, intracranial bleed,

head injury, facial fracture, laceration, tooth fracture, concussion, and blurred vision in his right

eye which is likely to result in a permanent disability.  In support of that assertion, Galipeau

relies on a medical record authored by Dr. Sterling regarding Galipeau's treatment on August 24,

2012.  That record states, in pertinent part, as follows:

> DIFFERENTIAL DIAGNOSIS:
> 1.    Intracranial bleed.
> 2.    Head Injury.
> 3.    Facial Fracture.
> 4.    Laceration.
> 5.    Tooth fracture.
>
> MEDICAL DECISION MAKING: . . . The patient is noted to have a minimally
> displaced nasal bone fracture on the right.  There were some soft tissue changes
> and apparent lacerations noted as well. . . . He was noted to have a 3.5 stellate
> lesion on his right medial brow as well as the right buccal mucosa of the upper
> jaw of the upper teeth. . . .

(Doc. 97-1 at 5–6.)

Even giving Galipeau the benefit of all reasonable doubts and inferences, the court cannot

conclude that the record shows that Galipeau was in fact conclusively diagnosed with all five of

the conditions listed under "differential diagnosis."  Indeed, a "differential diagnosis" is "the

determination of which of two or more diseases with similar symptoms is the one from which the

patient is suffering, by a systematic comparison and contrasting of the clinical findings."

*Stedman's Medical Dictionary* 243880 (28th ed. 2006) (Westlaw); *see also Kestner v. Colvin*,

No. C 13-04747 LB, 2014 WL 5517787, at *24 (N.D. Cal. Oct. 31, 2014) ("The very definition

of a differential diagnosis is that it is neither conclusive nor exhaustive, it represents a list of

possible diagnoses.").

Galipeau has come forward with no evidence that he sustained a fractured tooth.  Dr. Sterling never concluded that Galipeau had a fractured tooth.  (Doc. 91-16 at 25.)  Dr. Vinsel testified as follows regarding Galipeau's tooth:

> He did have a tooth, a right upper middle tooth that was tender when I touched it, but it didn't seem to be loose but exam of that was difficult because the patient was not allowing me to touch it too much to really examine it fully. . . .  I didn't feel that it was loose on my exam, and I didn't see any obvious fracture.

(Doc. 91-18 at 17.)  Galipeau did not see any dental care provider with regard to any injuries that he claims to have sustained as a result of Stemp's use of force.  Galipeau states that he "was supposed to" see a dental care provider, but did not have insurance at the time, so he "just didn't end up going."  (Doc. 91-7 at 42.)

Galpieau has also come forward with no evidence that he sustained an intracranial bleed.  Dr. Sterling found no evidence of an intracranial bleed.  (Doc. 91-16 at 18.)  Dr. Vinsel also never concluded that Galipeau suffered an intracranial bleed.  (Doc. 91-18 at 23.)  Galipeau's expert, Dr. King, also agrees that there is no evidence of intracranial bleeding.  (Doc. 91-10 at 5.)

Galipeau has also not produced objective medical evidence that he has sustained any permanent injury to his right eye resulting from Officer Stemp's strike.  Dr. Sterling noted no problems with Galipeau's eyes.  Dr. Vinsel also found no signs of injury to the eyes.  Dr. Stuart DuBoff—Galipeau's expert ophthalmologist—has opined that Galipeau will not suffer any permanent disability as a result of the events of August 28, 2012.  (Doc. 91-9 at 9–10.)  Galipeau did report to his social worker, Paula Shulman, that "his right eye is now scarred and it is noticeable to others" and that "his vision and headaches are worse now than since the injury."  (Doc. 97-9 at 17.)  Shulman noted that "[o]bviously someone who already has post traumatic stress disorder from a horrific and painful childhood injury such as this, injury to the good eye is only going to compound this patient's current symptoms."  (*Id.*)

## VII.    The Criminal Charges

Galipeau was cited and arraigned—and a court found probable cause—on the following six charges related to the August 24, 2012 incident: (1) DUI, third offense; (2) refusing a law enforcement officer's reasonable request for an evidentiary test ("DUI #3 – Test Refusal"); (3) attempting to elude a law enforcement officer; (4) operating a motor vehicle on a public highway in a negligent manner ("C&N"); (5) leaving the scene of a crash with property damage; and (6) resisting arrest.  On January 11, 2013, Galipeau pleaded guilty to and was convicted of attempting to elude a law enforcement officer, leaving the scene of a crash, and resisting arrest. The State dismissed the other charges (DUI #3, DUI #3 – Test Refusal, and C&N).  He was issued seven traffic tickets in connection with the incident, and received a civil violation judgment for a number of traffic violations.

## Analysis

## I.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding whether there is a genuine dispute of material fact, the court "construe[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."  *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010).  Initially the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once a properly supported motion has been made, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

II.     **Galipeau's Federal Claims**

A.      **Fourth Amendment Excessive Force Against Officer Stemp**

1.      **Qualified Immunity**

The court begins with the affirmative defense of qualified immunity.  That doctrine "'shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).  The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  The doctrine applies to mistakes of law, mistakes of fact, and mistakes based on mixed questions of law and fact.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

"[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, *viewed in the light most favorable to the plaintiff*, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Rogoz*, 796 F.3d 236 at 247 (alteration and emphasis in original) (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).  As to the second inquiry, "clearly established" means "'whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted.'" *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  "The right to be free of excessive force is clearly established." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996).  In this case, the only issue is therefore whether the force Officer Stemp used was reasonable under the circumstances. *See*

*Bettis v. Bean*, No. 5:14-cv-113, 2015 WL 5725625, at *8 (D. Vt. Sept. 29, 2015) (citing *Cowan*

*ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 n.7 (2d Cir. 2003)).

### 2.  Whether Officer Stemp Used Excessive Force

As the court previously observed, Galipeau's Fourth Amendment claim is effectively a

claim under 42 U.S.C. § 1983. (*See* Doc. 30 at 2.)  Constitutional claims of excessive force in

the course of an arrest are subject to the standards and requirements of the Fourth Amendment,

as made clear by the Supreme Court in both *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985), and

*Graham v. Connor*, 490 U.S. 386, 394–95 (1989).  These cases instruct that while officers may

use force in effecting an arrest, the use of force must be reasonable.  "As in other Fourth

Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an

objective one:  the question is whether the officers' actions are 'objectively reasonable' in light

of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137–39

(1978)).

To determine whether the force used was "reasonable," the court balances "'the nature

and quality of the intrusion'" against the "governmental interests at stake." *Id.* at 396 (quoting

*Garner*, 471 U.S. at 6).  This standard requires "careful attention to the facts and circumstances

of each particular case, including the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee*, 471 U.S. at 8–9).  "The

court may also consider 'whether there were exigent circumstances, whether the use of less force

was feasible and prudent, and whether the officer took reasonable steps to minimize the use of

force and any injury resulting from that force.'" *Bettis*, 2015 WL 5725625, at *8 (quoting

24

*MacLeod v. Town of Brattleboro*, No. 5:10-cv-286, 2012 WL 1928656, at *5 (D. Vt. May 25, 2012)).

Here, the evidence in the light most favorable to Galipeau fails to make out a Fourth Amendment violation. The court begins with the nature and quality of the intrusion on Galipeau's Fourth Amendment interests. The intrusion at issue here is Stemp's action striking Galipeau's face. There are some disputes about whether Stemp used only his fist or instead used a blunt object, and about whether Stemp struck Galipeau only once or several times. The evidence in the light most favorable to Galipeau establishes a relatively serious intrusion on his liberty.

The court now turns to the state's interest, beginning with the facts concerning the severity of the crimes at issue. Prior to the moment Stemp struck Galipeau, he had observed Galipeau speeding, and then, as Stemp approached Galipeau's stopped truck on foot after pulling it over, accelerating away from the traffic stop. Stemp then pursued Galipeau—with lights and siren—in a nighttime vehicle chase through downtown Bennington, where Galipeau exceeded the speed limit, failed to stop at multiple stop signs, drove on the sidewalk, and struck a (fortunately unoccupied) bench. After the truck came to a stop, Galipeau exited the truck and started running on foot without stopping, despite Stemp's verbal commands to stop, and despite the first instance of physical contact between the two men when Stemp fell to the pavement. All of those events suggest serious crimes had been committed, including attempting to elude a law enforcement officer, leaving the scene of a crash, and resisting arrest.

Regarding threats to safety, Galipeau's conduct during the vehicle chase could have caused serious personal injuries or property damage—fortunately it did not. Galipeau's conduct also put the safety of police officers at risk. In addition to the risks of the vehicle chase,

Galipeau's failure to stop during the foot chase put officers at risk (Stemp did in fact sustain

minor injuries).  And, until officers had gained control of Galipeau, it was unclear what other

risks he might pose to them or the public.  All of these factors suggest that the state's interest was

very strong at the time Stemp struck Galipeau.

The court also concludes that the circumstances at that moment could accurately be

described as exigent.  For the reasons discussed above, the court concludes that Galipeau has

failed to raise any triable issue as to whether he was in handcuffs at the time he was struck; he

was not restrained by handcuffs at that moment.  Stemp had also not had any opportunity to

search Galipeau for weapons.  After being tackled but before being struck, Galipeau stated, "You

got me, dude."  But that statement—made at most a few seconds before the strike—did not

eliminate the exigency.  *See Johnson v. Scott*, 576 F.3d 658, 659–60 (7th Cir. 2009) (suspect

evaded police in a car, then fled on foot after encountering a police roadblock; when he

encountered a fence, he turned around, put his arms in the air, and said "I give up"; court held

that officers were not required to take suspect's apparent surrender at face value, and that a

reasonable officer could think that the use of a police dog was necessary to help control the

suspect).

Galipeau asserts that *Johnson* is distinguishable because he had been tackled to the

ground and was not making any aggressive gestures.  (*See* Doc. 97 at 29.)  The fact that Galipeau

was on the ground did not mean that there was no potential threat to Stemp, especially since no

search had been conducted, and since Galipeau was not in handcuffs prior to the strike.  There is

a dispute about whether, immediately before he was struck, Galipeau turned only his head or also

his body, but in either case, in light of the circumstances, Stemp could reasonably conclude that

Galipeau might be turning to fight, and had to make a very quick decision about how to respond to the potential threat that Galipeau posed.

As to whether other or lesser force was feasible and prudent, and whether Stemp took reasonable steps to minimize the use of force and injury, the court notes that Stemp was not carrying a taser. (Doc. 91-1 at 24.) Stemp was carrying oleoresin capsicum ("OC") spray with him, (Doc. 91-2 ¶ 45), however, he did not use it because his close proximity to Galipeau meant he might also be exposed to the effects, and because accessing the OC spray would have allowed Galipeau time to access a weapon if he had one. (*Id.* ¶ 47.) Thus, the use of OC spray was not feasible or prudent.

Assuming that Stemp did use a blunt instrument and that he struck Galipeau more than once, the court cannot conclude that those facts might establish excessive force in the circumstances of this case. "Police officers 'are not required to use the least intrusive degree of force possible' to effect an arrest." *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 410 (D. Vt. 2009) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994)). A single closed-fist punch might have been sufficient to subdue Galipeau (in fact that is the force that Stemp says he used), but the use of a nonlethal impact weapon would still not have been unreasonable under the circumstances.

On balance, the state's interests outweighed Galipeau's interest in being free from a physical strike. Stemp's use of force was more than minimal—especially when the evidence is viewed in the light most favorable to Galipeau. But it was a reasonable use of force in light of the circumstances. Because the court concludes that Stemp did not violate Galipeau's Fourth Amendment rights by using excessive force, Galipeau has failed to establish an essential element of his § 1983 claim, and Stemp is entitled to summary judgment on that claim.

**B.**   *Monell* **Claim Against the Town**

To the extent that Galipeau's § 1983 claim is a claim against the Town under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), it necessarily fails along with Galipeau's § 1983 claim against Stemp. *See Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Unless a plaintiff shows that he has been the victim of a federal law tort committed by person for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable."); *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, at *8 (D. Vt. Apr. 8, 2013) (denial of a constitutional right is an essential element for § 1983 municipal liability under *Monell*).

## III.   State-Law Claims

Since the court has concluded that Defendants are entitled to summary judgment on Galipeau's federal claims, the court has discretion to decline to exercise supplemental jurisdiction over Galipeau's state-law claims. *See Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 416 n.22 (D. Vt. 2009) (citing 28 U.S.C. § 1367(c)(3)).[17]  As in *Crowell*, the court elects to retain jurisdiction.  All of Galipeau's claims arise from the same set of facts.  (*See* Doc. 30 at 3.) Several of the state-law claims are redundant with the federal claims, and none of them require resolution of any novel or undecided issue of state law.

### A.   Statutory and Municipal Immunities

Stemp claims that he is entitled to statutory immunity from all of Galipeau's state-law claims under 24 V.S.A. § 901(a) or, alternatively, under § 901a.  (Doc. 89-1 at 28 & n.7.) Section 901(a) provides, in pertinent part: "Where an action is given to any appointed or elected

---

[17] Galipeau's state-law claims are: assault, battery, intentional infliction of emotional distress, gross negligence, negligent infliction of emotional distress, and negligent supervision. (*See* Doc. 8.)

municipal officer . . ., the action shall be brought in the name of the town in which the officer serves . . . .  If the action is given against such officers, it shall be brought against such town . . . ."  Section 901a—enacted in 2003—applies to "municipal employees"[18] and includes a similar provision:

> When the act or omission of a municipal employee acting within the scope of employment is alleged to have caused damage to property, injury to persons, or death, the exclusive right of action shall lie against the municipality that employed the employee at the time of the act or omission; and no such action may be maintained against the municipal employee or the estate of the municipal employee.

24 V.S.A. § 901a(b).

Prior to the enactment of § 901a, this court observed that Vermont municipal police officers are appointed, *see* 24 V.S.A. § 1931(a), and thus § 901(a) requires that "suits against police officers who were acting in their official capacities be brought against the municipality." *Hee v. Everlof*, 812 F. Supp. 1350, 1351 (D. Vt. 1993).  It is unnecessary in this case to decide whether § 901(a) or § 901a applies.  For the reasons discussed below, the outcome is the same in either case.  Here, no facts suggest that Stemp's actions were outside of his official capacity.  Accordingly, the court analyzes the state-law claims as against the Town.[19]

The Town claims that it is immune from all of Galipeau's state-law claims on the grounds of municipal immunity.  (Doc. 90-1 at 21.)  In Vermont, "[m]unicipal immunity protects municipalities 'from tort liability in cases where the municipality fulfills a governmental rather

---

[18] The statute defines "municipal employee" to include "any person employed for a wage or salary by a municipality."  24 V.S.A. § 901a(a).

[19] If § 901a is the proper statute to apply, the court notes that that section does not extend immunity to "willful" or "intentional" acts or omissions.  24 V.S.A. § 901a(e).  Some of Plaintiffs' state-law claims are claims of intentional torts.  To the extent that Stemp might not be immune from those claims, he is nevertheless entitled to summary judgment for the reasons described below.

than a proprietary function.'" *Sobel v. City of Rutland*, 2012 VT 84, ¶ 14, 192 Vt. 538, 60 A.3d

625 (quoting *Courchesne v. Town of Weathersfield*, 2003 VT 62, ¶ 9, 175 Vt. 585, 830 A.2d 118

(mem.)).  Training and supervising police officers are governmental functions.  *Kucera*,

2013 WL 1414441, at *12.  The court therefore concludes that the Town is entitled to municipal

immunity as to Galipeau's negligent-supervision claim.  *See id.* (granting motion to dismiss

state-law negligent-supervision claim against town on municipal immunity grounds).

The court cannot reach the same conclusion with respect to Galipeau's other state-law

claims against the Town.  For those remaining claims, the Town is the properly named defendant

under § 901(a) or § 901a, and is only entitled to raise the defenses that Stemp could raise.  That

is explicitly so under § 901a.  *See* 24 V.S.A. § 901a(c) (municipality assuming the place of

municipal employee under § 901a(b) "shall waive any defense not available to the municipal

employee, including municipal sovereign immunity").  The same is implicitly true under

§ 901(a).  *Cf. Nelson v. Town of St. Johnsbury Selectboard*, 2015 VT 5, ¶ 61 n.11, 198 Vt. 277,

115 A.3d 423 (town sued for acts of its selectboard members under § 901(a) was entitled to

defenses that could be raised by selectboard members).  If the rule were otherwise, § 901(a)

would be hollow—why authorize suit against a town if the town is immune?  It is therefore

necessary to proceed to Galipeau's remaining state-law claims.

**B.    Assault and Battery**

Galipeau concedes that his assault and battery claims essentially duplicate his excessive-

force claim.  (*See* Doc. 97 at 37.)  As this court has previously held: "When assault and battery is

alleged against police officers, 'the inquiry is whether the officer's conduct was reasonably

necessary and thereby privileged.'"  *Crowell*, 667 F. Supp. 2d at 417 (quoting *Smith v. District of

Columbia*, 882 A.2d 778, 788 (D.C. 2005)).  Because the court has concluded that Stemp used

reasonable force, the Town is entitled to summary judgment on Galipeau's assault and battery claims as well.

### C.    Intentional Infliction of Emotional Distress

The Town is also entitled to summary judgment on Galipeau's intentional-infliction-of-emotional-distress (IIED) claim.  In Vermont, a prima facie IIED claim requires "outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Davis v. Am. Legion, Dep't of Vt.*, 2014 VT 134, ¶ 19, 198 Vt. 204, 114 A.3d 99 (quoting *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 848 A.2d 344).  As described above, Stemp's use of force was reasonable; no jury could reasonably conclude that his conduct striking Galipeau was outrageous such that it might support an IIED claim.  *See Crowell*, 667 F. Supp. 2d at 416 (where court had concluded that officers' use of force was reasonable, IIED claim based on use of force also failed).

Galipeau asserts that Stemp and other BPD officers engaged in outrageous conduct by refusing to allow him to receive prompt medical attention.  He contends that they intentionally refused to allow him to receive medical attention at the scene of the strike, and that, while he was in the holding cell, the officers took no action despite his repeated requests to be taken to the hospital because he could not see.  Galipeau contends that he endured pain and anguish because—in light of his preexisting injury to his left eye and possible new injury to his right eye—he was genuinely concerned about whether he would be able to see again. (*See* Doc. 97 ¶¶ 63, 73.)

Here, even assuming that Sergeant Plusch was unjustified in determining that Galipeau's demeanor warranted redirecting the ambulance to the police station, that conduct falls far short

of outrageous.  The police station was not far from the scene, any delay resulting from

redirecting the ambulance was minimal, and there was no obvious indication that even that short

delay might have negative medical consequences.

Moreover, even crediting Galipeau's contention that he requested to be taken from the

holding cell to the hospital, and assuming that BPD officers heard those requests, any delay was

brief; it is undisputed that Bennington Rescue was dispatched to return to the police station at

about 11:36 p.m.  Only a few minutes earlier, Galipeau had declined medical attention that had

been offered.  Moreover, when Stemp and Howard learned that it would take an additional

25 minutes for Rescue to transport Galipeau to the hospital, they transported him themselves.

On these facts, no reasonable jury could conclude that the officers' conduct was "so outrageous

in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable

conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Davis*,

2014 VT 134, ¶ 20 (quoting *Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265, 79 A.3d

854).  The court concludes that Galipeau's IIED claim premised on refusing prompt medical care

fails as a matter of law.

**D.      Gross Negligence and NIED**

To the extent Galipeau's negligent-infliction-of-emotional-distress (NIED) claim is based

on BPD officers' alleged refusal of prompt medical care, it also fails.  Galipeau's NIED theory

for that alleged conduct relates to events separate from and occurring after the physical strike.

To prevail on that theory, Galipeau would have to show that "(1) he was within the 'zone of

danger' of an act negligently directed at him by defendant, (2) he was subjected to a reasonable

fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness

as a result." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 125, 730 A.2d 1086, 1092 (1999).  Here,

Galipeau might have feared losing his eyesight, but after the strike he was no longer in any "zone of danger," nor could his fear have been one of any "immediate" personal injury.

To the extent Galipeau's gross negligence claim is based on BPD officers' alleged refusal of prompt medical care, it fails as well. "Gross negligence is negligence that is more than an error of judgment; it is the failure to exercise even a slight degree of care owed to another." *Kennery v. State*, 2011 VT 121, ¶ 41, 191 Vt. 44, 38 A.3d 35. Although gross negligence is ordinarily a question of fact for the jury, the court may dismiss it if reasonable minds could not differ. *Id.* Here, none of the officers' conduct could be described as failure to exercise even slight care. To the extent Sergeant Plusch caused delay by redirecting the ambulance to the police station, the delay was entirely minimal. To the extent BPD officers caused delay by not immediately taking Galipeau to the hospital from the holding cell, that delay was also slight, and officers in fact acted to transport Galipeau to the hospital themselves when they learned that Rescue would take an additional 25 minutes.

To the extent the gross negligence and NIED claims are based on Stemp's use of force, they fail because that conduct was intentional; the concept of negligence cannot apply to such intentional conduct. *See Steele v. Rochester City Police Dep't*, No. 6:16-cv-06022-MAT, 2016 WL 1274710, at *3 (W.D.N.Y. Apr. 1, 2016) (no negligence claim could be sustained where excessive-force and assault claims were premised upon defendant's allegedly intentional conduct); *Pluma v. City of New York*, No. 13 Civ. 2017 (LAP), 2016 WL 1312087, at *9 (S.D.N.Y. Mar. 31, 2016) (same); *Burwell v. Peyton*, 131 F. Supp. 3d 268, 300 (D. Vt. 2015) (claims alleging intentional acts do not give rise to claims sounding in negligence).

33

## Conclusion

For the above reasons, Defendants' motions for summary judgment (Docs. 89, 90) are GRANTED.

Dated at Rutland, in the District of Vermont, this ⬩ day of June, 2016.

Geoffrey W. Crawford, Judge
United States District Court